(No. 95-CC-3948–■■■■■■)

HELEN LUNDY and JACK BARNES, Claimants, *v.*
ILLINOIS DEPARTMENT OF TRANSPORTATION, Respondent.

*Opinion filed March 26, 2001.*

HELLER, HOLMES & ASSOCIATES, P.C. (DAVID
STEVENS, of counsel), for Claimants.

JIM RYAN, Attorney General (PHILLIP MCQUILLAM,
Assistant Attorney General, of counsel), for Respondent.

OPINION

EPSTEIN, J.

This is a swale case. This contract claim against the
Respondent's Department of Transportation ("IDOT")
for improper excavation/construction of an agreed swale
is before us for final decision after trial to Commissioner
James E. Shadid. We have the case on the pleadings, the
trial record, which includes extensive technical testimony
and exhibits, the report of the Commissioner and the par-
ties' post-trial briefs. Although the Respondent's post-trial
brief was unconscionably late, and was filed without leave
of court, we allow the Respondent's brief in the interest
of assisting the Court through this large complex record,
which we have reviewed in detail.

Nature of the Claim

This claim is brought as a breach of contract action.
Claimant seeks contract damages for injury or loss of

farming use of a portion of an 80-acre tract of farmland owned by Claimant Helen Lundy, and actively farmed by her tenant farmer, Claimant Jack Barnes, in Douglas County. (The subject property lies approximately one-half mile south of Arcola, Illinois.) Claimants allege that IDOT breached—by improper performance—a written contract between Lundy and IDOT that provided for IDOT to excavate and regrade a portion of the Lundy land to improve and/or restore drainage for the adjacent State highway (Route 45) and, seemingly and perhaps incidentally, for the adjacent land area as well.

Claimant alleged that IDOT breached the specific terms of a letter agreement between Lundy and IDOT, dated December 11, 1991 (Complaint, Exhibit A) (executed by Lundy on January 8, 1992), that provided for IDOT to cut and restore a swale through the Lundy property for drainage purposes in accordance with a specific agreed plan that was reduced to drawings—particularly a "typical cross-section" of the proposed swale with specific dimensions—based on a current survey of the property. A second IDOT letter, dated March 31, 1992, and accepted by Lundy's letter to IDOT of April 2, 1992 (Exhibit No. 17) modified the terms of the agreed excavation project somewhat.

Claimants alleged that IDOT's excavation work, which was done in the Fall of 1992 and the Spring of 1993, and the resulting swale on the Lundy land, did not conform to the agreed specifications and resulted in the loss—*i.e.*, the loss of its use for farming—of more than four acres of the Lundy farmland and the consequent loss of farm income to Claimant Barnes.

Claimants also complain, *inter alia*, that the resulting swale "is so deep that it has effectively split the farm into two halves so that farm equipment, machinery and vehicles

cannot cross [the swale]" (Complaint, par. 7, 8), which Claimants maintain is contrary to representations that were made by IDOT officials to Claimant Barnes during the discussions of the swale project with Mrs. Lundy's attorney. Claimants also complain that the swale causes water "to flow onto the farm and to remain standing rather than draining away, causing a permanent bog" (Complaint, par. 8), thus reducing usable farm acreage. Finally, Claimants assert some oral agreements and representations as to the process of the IDOT excavation work, including the giving of notice to Mr. Barnes and an opportunity for him to be present during the work, doing the work only when the ground was dry, and disposing of the excavation debris by distribution on the remainder of the Lundy land.

Claimants seek $100,000 compensatory damages, which they do not allocate between themselves in their complaint.

## Nature of the Defense

IDOT has defended this claim on the bases: (1) that it did not breach, or did not materially breach, the agreement as to the specified dimensions of the swale; (2) that the "representations" allegedly made to the Claimants were not part of any of the letter agreements between the parties and are not actionable in this contract case, as they were not pleaded; (3) that Claimant Jack Barnes is not a party to the Lundy-IDOT agreements and cannot claim contract rights or contractual inducement by IDOT "misrepresentations"; (4) that IDOT did not agree or represent to Mrs. Lundy that farm operations would be unaffected and unreduced by the swale, and (5) that it was clear and was understood that part of the swale project was to restore a prior drainage swale through the Lundy lands that had silted up due to silt deposits carried by water flow to obstruction(s) located on the Lundy land, as

well as from farming activities above and below obstruction(s) on the property, and that Mrs. Lundy and Mr. Barnes knew or should have known that removal of the siltage would reduce the farmable acreage that Mr. Barnes had been farming on the siltage built up in the prior swale area.

## The Trial Record

Claimant Barnes was the sole occurrence witness for the Claimants, who also presented one expert witness, John C. Guillou, an engineer. Respondent presented the testimony of Jerry Wilhoit, a field maintenance official of IDOT, Kevin Knoepfel, a bridge and hydraulic engineer, Leon Gobel, also of IDOT, who was Respondent's sole occurrence witness, and Jack Barnes as an adverse witness.

The parties introduced numerous exhibits, relating to the parties' negotiations and agreements, relating to the engineering and construction of the swale, and relating to the drainage characteristics of the Lundy property and adjacent areas.

## The Evidence

We summarize the evidence by adopting the trial summary report of our Commissioner, here excerpted:

"The contract, when finally approved, was by way of letter of December 11, 1991 and March 31, 1992 from the Illinois Department of Transportation to Mrs. Lundy. A survey had been completed that time and decisions had been made based upon the survey. The drawing showed a proposed typical cross-section of a swale with a 70-foot tip width and 10-foot bottom width, 10:1 side slope and a 3-foot nominal depth. Ms. Lundy accepted IDOT's by sending a letter in return on April 2, 1992. (Exhibit 17.)

Exhibit 18 was one last IDOT memo to the file, dated April 2, 1992. It memorialized a meeting between Gobel, Mrs. Lundy, Mr. Barnes, and Bumpus (Exhibit 18). Mr. Barnes made certain requests which are noted in the memo, including that he be notified prior to the start of any work at his specific telephone number. It was after this meeting, and obtaining IDOT's agreement to Mr. Barnes' request, that Mrs. Lundy signed and returned the proposal letter. (Exhibit 18.)"

The actual excavation began in the Fall of 1992 and was completed in the Spring of 1993.

During this trial, there was often complicated and complex testimony about waterflow through the property and location of field tiles as well as siltation buildup.

Plaintiff's expert, John C. Guillou, testified that he was an engineer with degrees from the University of Southern California and University of Illinois. Exhibit 22 was a copy of his curriculum *vitae*. In preparation for his testimony, Guillou had reviewed various documents and physically visited the land in question on August 4, 1995, September 12, 1995, December 1, 1995, December 30, 1995 (actually 1996; T. 121), and January 21, 1998. Group Exhibit 30 is a series of 25 photographs he took on September 12, 1995.

Exhibit 33 is a drawing showing the results of survey work done on the site by Guillou on December 30, 1996. As shown by solid line, it's the cross-section of the swale that he understood to have been agreed to by Mrs. Lundy and shown by a dash line is the actual cross-section of the ditch as he measured it on December 30, 1996. The cross-section that was seen on the date of the survey was slightly in excess of the cross-section that was agreed to by Mrs. Lundy. The drawings indicate excess top work, bottom width and depth and both locations.

He testified that it was his opinion to a reasonable degree of scientific certainty that the completed work by IDOT did not correspond to the agreement (T. 126-27). He said that he reached that conclusion because the top widths were less than those measured and the depths were greater than those set

forth in the document. He was unable to make a determination regarding the bottom width because of the erosion that had taken place. It was his opinion to a reasonable degree of scientific certainty that the erosion that had occurred was from adjacent fields into the waterway. It was Mr. Guillou's opinion to a reasonable scientific certainty that Mrs. Lundy and Mr. Barnes had been damaged by the work that had been done because the bottom of the ditch will probably always be too wet to work. He testified that, in much of the area, it would not even be possible to cross the ditch on foot without sinking into the mud. (T. 130.)

For the Respondent, Jerry Wilhoit testified; he is in field maintenance and for 12 years has maintained roadways. He testified that on the Lundy job, the maintenance force that excavated the ditch was present most of the time, meaning once or twice per week. He further testified that the State did provide advance notice by informing Mr. Jerry Stout, who is believed to be Mrs. Lundy's attorney. The Claimant raises a number of issues about whether Mr. Stout was in fact the attorney or not, but those seem to be matters that should have been resolved between Mrs. Lundy and Mr. Stout. He testified that the State told Mr. Stout, at the end of March of 1993, and was in contact with Mr. Stout a couple of times to tell him the process and to find out what kind of slopes from Mrs. Lundy were to be approved. He testified that the final word came from Stout just prior to doing the work.

He further testified that they located field tile and, during construction, located other tile until the swale was complete and then relocated them under

the swale and hooked them into the main tile. He testified all field tile was intact at the conclusion of the work. He testified that the swale was then spread over an adjacent field with small endloaders and roadgraders and that hazardous materials and asphalt were removed by excavation. The job was completed May 25, 1993 and it was his testimony that their work did not interfere with the farming operation. It was his opinion at the conclusion of the project that the excavated ground, according to the agreement, was within a couple of inches off the proposed grade.

Kevin Knoepfel also testified for the Respondent. He testified that he is a bridge and hydraulic engineer. He testified that the final bottom of the swale was within 2-3 inches of proposed. He testified that the swale was excavated according to the plan submitted to Mrs. Lundy and further testified that whenever you are working with dirt, if you can get within 1-3 inches over 1800 to 2000 feet, then that would be considered very close. He testified that it was more than adequate for drainage purposes. He testified that it couldn't maintain flow if the width of the top was 70 feet all the way through, and that the most important area is the bottom because that is what keeps the flow line moving. He testified that for the purpose of drainage, you must establish the bottom first, then put in the slope of 10:1 as the landowner wanted. He did say that the top width average was wider than 70 feet and this results in more area taken out than originally proposed.

Also testifying for the Respondent was Leon Gobel, who is also an employee of the State. Gobel testified as to the history of the land and conversations

with the parties. He testified about claimant Barnes asking questions about crossing the swale on farm machinery and also asked Gobel about farming across the swale. Gobel testified that IDOT assured him he could cross the swale with farm equipment, but qualified that the previous tenant's farming practice contributed to this problem. He testified the purpose of this project was because the State observed flooding problems from 1984 to 1991 and their goal was to reestablish drainage as previously existed from the USGS map and original survey. He testified that in their initial letter to Mrs. Lundy, he asked for permission for survey with a proposed swale of 56 feet. He testified that it was Mrs. Lundy's wishes that the swale be 70 feet.

Jack Barnes was called last as an adverse witness by the State and testified that the decision to opt for a 10:1 ratio was because the intention was to farm across and to have a flatter swale. He testified that he does not recall anyone from IDOT calling him prior to the work and was not told he could farm the swale, but then later said he could only drive across. He reiterated that he hasn't been able to farm the swale since 1973 and further testified that he can't drive across the swale.

## Liability—Breach of Contract

The liability issues presented are easily resolved. We find that IDOT did breach the terms of the IDOT-Lundy agreement insofar as IDOT's performance—the excavation and regrading of the swale—failed to comport with the parties' agreed design in two material respects: the width of the swale top, and thus the total amount of land area used for the swale, and the depth of the swale which was deeper than planned.

However, we must reject Mrs. Lundy's and Mr. Barnes' claims based on the alleged "representations" that were supposedly made to the Claimants as to farmability of the swale area and transportability across the regraded swale. These charges are neither convincingly established nor is the Court even close to being persuaded that such representations, if they were made as such, were either inducing factors or could credibly or reasonably be relied upon. Moreover, any representations made to Mr. Barnes are immaterial, as he was neither a party to the agreement nor was his approval or consent required for the swale project, at least as shown in this record.

A thorough review of this record, particularly the topographical, drainage, and photographic evidence convinces this Court that it was sufficiently clear and must have been understood by Mrs. Lundy and Mr. Barnes as well, as longtime residents and farmers in this area, that the swale project was intended to, and would, restore a prior drainage swale that had existed through the Lundy lands and that had provided drainage for that and upstream farmlands. That was simply not a secret or an ancient unknown condition of the land. They knew, or must be deemed to have known, that the longstanding drainage way—the pre-existing ditch or swale—had silted up due to silt deposits carried by water flow to obstruction(s) on the Lundy land as well as due to siltage resulting from farming activities and obstruction(s) on the Lundy property, and must eventually be restored to permit at least adequate flowage.

The parties plainly understood that IDOT's cleaning out the swale/drainage would benefit both the Lundy property and the State's roadway, as well as the upstream drainage areas, by improving the water flow across these lands. What we do not know from this record are the proportions of the drainage benefits realized by the Lundy

property, the State roadway, and other properties—and it is likely that IDOT or Mrs. Lundy or anyone else knew that, which is probably the reason that the Respondent, through IDOT, proceeded by way of contract rather than by way of drainage law to improve the drainage for Route 45. In any event, this Court is bound to treat this claim as a contract claim despite the obvious and strong overlay of drainage and drainage law considerations.

Our findings lead to liability for breach of the IDOT-Lundy agreement—but only in favor of Mrs. Lundy, the sole party to the contract with IDOT.

We must reject any contract liability to Mr. Barnes, as he was not a party to the contract, nor was he a third-party beneficiary of that contract, which contains no indication that the agreement was intended to be for his benefit. Ironically, the evidence shows that the proposed swale (and hence the agreement to construct it) was contrary to Mr. Barnes' interests as tenant farmer as it necessarily would reduce the farmable area available to him, of which he complains strongly. We observe that much evidence—particularly damages evidence—was admitted on the basis of Barnes' presence as a party, and that if Mr. Barnes had been dismissed on a pre-trial motion, that evidence would seemingly have been excluded as irrelevant.

## Damages

The damages issues in this case are the harder part, and have absorbed a disproportionate amount of time and consideration of this Court. Most of the damages evidence pertains to the claimed economic damages of Mr. Barnes, the tenant farmer, whom we are dismissing as lacking standing to claim contract damages, and is thus immaterial.

We are left to determine the loss to Mrs. Lundy, which is her claimed loss of value of her land caused by IDOT's

malfeasance of excavation and grading. Her claimed damages to her land has three components that warrant consideration: (1) loss of farmable land area, due to the overbreadth of the swale, particularly at the top; (2) loss of farmable land at the bottom of the swale, due to persistent wetness and excessive depth beyond the agreed design; and (3) inability of farm equipment to traverse the swale, thus allegedly dividing the farmland into two distinct parcels for farming operations. (This last damages claim was advanced primarily in Mr. Barnes' claim of increased farming costs, but it plainly was urged on Mrs. Lundy's behalf as well, albeit indirectly.)

We cannot find established damages in the second and third claimed damages elements. The inability to farm the bottom of the swale derives primarily from the fact that it remains wet due to its performance of the drainage mission for which it was recreated. That was necessarily foreseeable, even obvious, and hence must be taken as agreed by the parties absent contract language to the contrary, of which this contract contains none. Moreover, this Court is loathe to find damages for loss of "farmable" land that was previously—and undisputedly, to some extent—drainage area that has not been shown to have been simultaneously usable for drainage and growing crops in the past. Absent proof, we will not presume drainage areas to have legitimately been farmable land, especially in light of the legal drainage burden on downstream lands.

The equipment traversing problem has not been shown to be a factor that reduces the value of the land. Moreover, the Court will take notice that both permanent and temporary (seasonal) bridging technologies exist that could readily provide cross-swale access for farm equipment at nominal costs. There is no evidence in this record that the land has depreciated due to the marginal costs of providing access across the swale at critical points.

This leaves the issue of the unagreed loss of farmable land due to IDOT's excessive deployment of the swale beyond the agreed design on Mrs. Lundy's property. After much consideration, we have concluded that Claimant's arguments, while imperfect, provide the basis for calculating the amount of land taken out of farming use at the overly-widened top of the swale. From Claimant's calculations, we find that the average width of the swale top is 113 feet, instead of the agreed 70 feet (see Brief of Claimants, at 54-54), which is an excessive 43.2 feet aggregate average width in excess of the design width. This computes to 2.89 acres of total area removed from farming production and dedicated to drainage contrary to the parties' agreement.

We thus find Mrs. Lundy's property has been damaged to this extent. The assignment of a pecuniary damages amount to this land use loss is not a straightforward exercise on this record, as we are not favored with the kind of competent expert appraisal evidence, or even comparable land value evidence, that a property damage claim warrants, and usually receives, in contested litigation.

This record contains one piece of evidence of farmland value, at $4,500 per acre (of tillable land, we presume) (see, R. Tr.202), which is effectively uncontradicted and undisputed. Although the court senses that that is a high figure, we are constrained to use it in the absence of other contrary evidence. However, we take that to be the value of an acre, *i.e.*, to the full rights and benefits of an acre of land. Although Mrs. Lundy has lost the *farming use* of the 2.89 acres, she has not lost fee ownership of them nor their possession for some other use. We cannot say that the damages are the entire value of the unfarmable land, although we think it apparent that such use is the traditional and most valuable use in that area.

In the absence of expert testimony of the residual value of the land, the Court is left to assign a residual value and award the remaining loss as damages to Mrs. Lundy. After review, we find that a residual value of $750 per acre is fair. This leaves the computation of damages as 2.89 acres × ($4,500 - $750) = $10,837. That will be our damages award.

Conclusion and Order

For the foregoing reasons, it is hereby ordered:

1. The breach of contract claim of Helen Lundy against the Respondent is allowed; and

2. Helen Lundy is awarded the sum of $10,837 in full and complete satisfaction of her claim herein;

3. The breach of contract claim of Jack Barnes against the Respondent is denied, and forever barred;

4. This case is closed.